[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a contested dissolution of marriage in which the parties have been unable to resolve the issues of alimony, division of marital assets and related financial matters.
The parties were married in Bloomfield, Connecticut, nine years ago, on August 20, 1981. It was his second marriage, her first. He is fifty years of age, she is forty. They have each resided continuously CT Page 1292 in the State of Connecticut for the past twelve months and neither has been a recipient of public assistance from this state or any governmental agency. No minor children have been born to the plaintiff wife since the date of the marriage.
Plaintiff wife is a physician earning $47,784 after taxes from her part-time medical employment (plus $6349 of interest income). She is about to join Hartford Anesthesiology Associates, where she will develop a specialty in ambulatory anesthesiology, providing her will an annual income of $112,500 for the first year, increasing by $25,000 annually until she reaches a salary of $250,000.
Defendant husband, a cardio-vascular surgeon, has an after tax professional income of $1,281,228 and additional $28,181 after tax from non-medical sources.
Assets of this marriage total $3,794,576. Plaintiff wife asks that the court add two additional items to the marital assets:
1. $1,000,000, representing the value of defendant husband's medical practice, and
2. $1,200,000 spent by defendant husband to educate his adopted Japanese Daughter, establish a Japanese medical clinic and purchase a home in Japan for his mother.
MARITAL ASSETS: DEFENDANT HUSBAND'S MEDICAL PRACTICE
At the time of the marriage, husband was one of four principals in a thoracic cardio-vascular medical group. He testified his group generated an income of approximately $2,300,000 in 1982, sixty to sixty-five percent of which was the result of his efforts. He received a twenty-five percent share, as one of four members of the group.
During 1983, defendant husband testified that he withdrew from the group and began an individual private practice. Plaintiff wife testified to helping locate the office space, participating in "setting it up" and ordering some equipment. She spoke of working three hours a week in the office and five hours a week at home, doing the bookkeeping and "managing the business side of his office", for which she received $700 a week. She also referred to her efforts in entertaining his residents, other cardiologists and some physicians.
The court finds, based upon the credible facts of this case, that plaintiff wife's role in defendant husband's medical practice was not a substantial one and that she received financial compensation for the largest portion of those efforts.
Defendant husband's sixty-five percent portion of the 1982 group practice equalled approximately $1,500,000 at that time. Adjusted for CT Page 1293 the rising fee structure of the medical profession in the past eight years and the normally increasing patient load of a maturing practitioner, this 1982 gross income amount is reasonably proximate to the defendant husband's gross income shown on his 1989 individual income tax return (Plaintiff's exhibit No. 11), to his current sworn financial affidavit and to other testimony received at trial.
After reviewing the testimony offered, the court finds defendant husband's current sole practice is generally similar to the practice generated by him as a member of the thoracic cardio-vascular group practice that preceded the marriage. Basically, only the business form of the practice has changed. Defendant husband remains the same cardio-vascular surgeon.
Thus, based on the facts found in this case, defendant husband's medical practice if found to be a pre-marital asset, and is, therefore, not to be tabulated for purposes of a division of marital property.
Allan Yanaro, Certified Public Accountant for the defendant husband, who testified he was referred to Dr. Takata by Attorney Richard Weinstein, a cousin of plaintiff wife, offered uncontradicted testimony that the court feels further supports this finding, though from another prospective.
Mr. Yanaro spoke of a formula for evaluating medical practices as being fifty percent of a practitioner's gross income. Asked if that formula would apply to the defendant husband's practice, Mr. Yanaro replied affirmatively. Asked if the defendant husband could see the practice, Mr. Yanaro replied that the cardio-vascular surgeon could only sell his practice "if he stayed on." Without him, Mr. Yanaro testified, "the formula doesn't apply."
MARITAL ASSETS: FUNDS EXPENDED BY DEFENDANT HUSBAND IN JAPAN
The second request of plaintiff wife is for the court to add $1,200.00 to the marital assets to reflect those funds expended by Hiroyoshi Takata for his Japanese family.
When the plaintiff elected to marry, she chose someone who was a product of the Japanese culture, someone who embraced values that differed in some ways from our American culture. Though living in the United States, Hiroyoshi testified that he continued to maintain a close bond with his family in Japan. He traveled there with regularity. His relationship with his mother is a close one and reflects a high regard for her needs and her thinking. He constantly refers to, and is often guided by, his mother's comments and advice.
Hiroyoshi Takata testified at length about his mother selling rice in Kobe, as well as portions of her dowery, and working full time as a teacher and after hours as a tutor, all in order to educate him. He CT Page 1294 testified to his low salary as a rotating intern at the United States Naval Base in Japan, during which time his mother continued to support him.
He spoke of the Japanese tradition that the first born son inherits the family estate and assumes significant responsibilities in caring for family members.
Hiroyoshi Takata was the first born son. He testified that when he came to the United States there was no one remaining in Japan to succeed him in assuming his traditional responsibilities. One brother moved away. His second brother married, dropped his surname and took his wife's surname to maintain that family's name. His youngest brother died at the age of twelve.
He testified that he was indebted to his mother for what he was today and that he repays her by continuing to assume his traditional familial responsibilities.
Hiroyoshi Takata testified that in exchange for the services of a physician at the Japanese medical clinic he established in memory of his deceased youngest brother, he personally provides surgical services during his visits to Japan as well as providing medical training in the United States for a Japanese medical student each year. To provide living quarters for that student, Dr. Takata purchased 30 Howland Drive, in West Hartford.
Hiroyoshi Takata testified that four years ago he adopted his sister's daughter as his own daughter, so that she would become his successor within his family. She is now 16 years of age and enrolled as a second year student in Kawasaki High School, a private high school affiliated with Kawasaki Medical School. Kawasaki High School students are given priority when they seek admission to Kawasaki Medical School. Admission to the high school, however, requires a substantial financial contribution. Dr. Takata testified to contributing $117,000 and to meeting all the costs of his adopted daughter's schooling, including tuition, books and tutors. She is expected to assume responsibility for the clinic after completing her medical education.
In addition, Dr. Takata testified that he purchased a home for his mother. She is no longer working and now focuses on religious life.
This court finds Hiroyoshi's testimony credible. The expenditures are culturally appropriate for this man, born and raised in his Japanese culture. The expenditures are neither unexpected nor cunning. They are a forseeable use of funds earned by this Japanese son. No evidence credible was offered to the contrary. Nor was any credible evidence offered that the expenditures were protested by plaintiff wife when they were made. Defendant husband CT Page 1295 testified that he discussed purchasing a home for his mother with his wife and that she agreed. He testified further that until May of 1988, his wife "took care of the books and sent money to Japan."
Plaintiff wife did not condemn the expenditures during trial, merely the bookkeeping, asking that they be tabulated as marital assets for purposes of calculating her share. Wife's apparent acquiescence then, and lack of condemnation now, reflects their logic within this marriage and this fact situation.
The facts of this case indicate to this court that the expenditures are as much a marital expense as the cultural items more traditionally associated with marriages at this economic level: theatre tickets, vacations, country club dues and charitable contributions.
The court finds the defendant husband's testimony to be credible, and, based upon the facts in this case, holds that the funds expended by Hiroyoshi Takata are not to be included among the marital assets to be divided between he parties.
FAULT
Plaintiff wife raises another issue, making repeated references to those portions of sections 46b-81 (Assignment of Property) and46b-82 (Alimony) that refer to "the causes" of the dissolution. Plaintiff wife claims this dissolution comes about through the fault of her husband. She testified she became pregnant in February 1988, following a 1987 miscarriage, and that her husband told her he did not want the child. Believing it was necessary to salvage her marriage, she claims she reluctantly ended the pregnancy on May 4, 1988. Defendant husband testified that the next day, on May 5, 1988, he told his wife he wanted a divorce. Plaintiff wife cites this behavior as "fault of the most primative kind".
This court finds that defendant husband clearly established, at the onset of the marriage, that he did not want children. His statement that led to plaintiff wife ending her pregnancy was not an unexpected statement, but a consistant one. His decision to dissolve the marriage immediately following her painful compliance, however, was clearly unanticipated.
Plaintiff wife assumed responsibility for birth control and used an IUD device, but testifies she was compelled to remove it because of a gynecological infection. Husband and wife discussed the problem. Husband testifies he elected not to undergo a vasectomy, but instead accepted the responsibility of using condoms. He purchased them and stored them at home, but admits that he failed to bring them to Florida, where, on January 14, 15, 1988, he believes his wife conceived. Nor did he meet his familial responsibility by purchasing replacements, a simple enough task. CT Page 1296
This court finds that husband's behavior led to both his wife's pregnancy and to her termination of the pregnancy. This court further finds that upon learning of the pregnancy, he deceived his wife, who had been led to believe that terminating the pregnancy would preserve their marriage. He did not alert her to this decision to dissolve the marriage until after she ended the pregnancy. Hiroyoshi Takata, an otherwise honorable man, became duplicitous.
Though offered ample opportunity on direct and cross examinations to explain both his sudden decision to divorce and his election to withhold that decision from his wife until the pregnancy had been terminated, defendant husband offered no explanation that the court found to be appropriate to the ethical standards of a marital relationship.
Defendant father did testify that one month earlier, on April 2, 1988, he fell off a ladder and broke his left wrist while fixing his son's basketball hoop. A bad break, it required open reduction, metal pins and surgery to remove the pins. He reported he feared the loss of his career. A partial explanation, perhaps, for his aberrant behavior, but not one that excuses that behavior.
Two weeks later, defendant husband had second thoughts and asked his wife to attempt a reconciliation. She refused. The dissolution he sought had now become a dissolution she insisted upon. Clearly, her decision was generated by his previous conduct. The circle was complete. His behavior on May 5th had now become the basis for her to seek dissolution of their marriage.
Plaintiff wife stresses her husband's duplicitous behavior in a plea to be awarded both a larger portion of the marital estate and a more substantial alimony award than she might otherwise receive.
The court finds husband to be at fault, but notes that fault is only one of may criteria enumerated in sections 46b-81 and 82 of the Connecticut General Statutes. This court has considered all of the criteria. The marriage is one of relatively short duration. Husband is ten years older than wife and the age differential may well effect his opportunity for future acquisition of capital assets and income. Testimony fails to indicate any differences in their health. Each enjoys a high station, occupation, vocational skill and employability. Although husband's income is likely to remain more substantial that wife's for some period of time, she can reasonably anticipate a handsome professional income, as well as a substantial investment income, of her own.
MARITAL ESTATE
This court concludes, and the parties substantially agree, that the CT Page 1297 basic martial estate, as set forth primarily in husband's August 6, 1990, sworn financial affidavit, is as follows:
Real Estate: 553,283
General partnerships 299,251
Limited partnerships 198,900
Motor vehicles 364,000
Other personal property 413,174
Savings 388,583
Stocks, bonds, mutual funds 565,295
Other assets 860,488
IRAs 22,021
CNB, Investment Club 30,000
Frenchman's Creek 16,000 ________
$3,710,995
Less husband's pre-marital estate 400,000 conceded by plaintiff
$3,310,995 Total of marital assets
ALIMONY
Plaintiff wife spoke of entertaining on behalf of defendant husband, performing services as an employee of his practice and having "a wonderful relationship" with the children of his first marriage when they visited. She placed little emphasis on these contributions as the basis for an alimony award, however.
She emphasized her request that defendant husband be ordered to pay her alimony for a period of seven years in order to compensate her dollar for dollar for the loss of income she will incur during the next seven years as she enters Hartford Anesthesiological Associates and climbs from an annual salary of $112,500 to $250,000, adding $250,000 each year. She maintains she would already be earning $250,000 a year today but for her marriage and the resultant postponement of her specialized anesthesiological training.
Nancy Takata has lost some income. She has also lost some CT Page 1298 seniority. But marriage is not an insurance policy, guaranteeing to reimburse each partner for every economic loss. Postponing an opportunity to train towards a cardio-vascular anesthesiological specialization was a choice made by a well educated, sophisticated and mature woman. This court had the advantage of observing her during direct and cross examination. Worldly and aware, she knew marriages could fail. She knew the man she chose to marry had already experienced a failed marriage. She knew, or should have known, that a high percentage of marriages end in divorce. She also knew she was marrying a man totally dedicated to his profession, who sometimes worked as much as eighty hours a week and was subject to call at all hours. To complicate matter still further, she knew she was marrying a man who adhered to a culture different from her own.
ORDERS
A decree of dissolution may enter on the grounds of irretrievable breakdown. Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, the following orders shall enter:
1. DIVISION OF ASSETS
a. Wife shall received assets totaling $1,655,500 as follows:
West Palm Beach home 233,283
furnishings in that home 50,000
Jewelry 50,000
Furs 7,500
Wife's retirement plans 92,066
Investment Club 18,000
1985 Porsche 911 20,000
b. The items to comprise the balance of $1,184,649 shall be chosen by defendant husband and transferred to plaintiff wife from among those assets listed in husband's August 6, 1990, sworn financial affidavit in sections II. F, G, I, J or from among IRAs at Society for Savings, $10,658: IRAs at Prudential Bache $11,363; CNB savings and checking accounts, $12,000; and Frenchman's Creek, $16,000 (providing Frenchman's Creek is an asset that presents a financial value to wife).
c. Transfers from other categories (sections II. A, B, C, D, or E of defendant husband's August 6, 1990, sworn financial affidavit) may be CT Page 1299 made only with both parties' written approval, which writing is to be filed with the court for its approval.
d. If both parties agree in writing, the mandatory transfers of assets set forth by the court, in 1. a. above, may be varied however the parties mutually elect. Any written agreement in variation thereof is to be filed with the court for its approval.
e. All transfers shall be completed within thirty days hereof, unless otherwise mutually agreed in writing, which writing is to be filed with the court for its approval.
2. PERIODIC ALIMONY
a. During the parties mutual lives, Wife, until her remarriage, shall receive periodic alimony, beginning September 1, 1990 and on the first day of each succeeding month, of
1. $7000 a month for the first twelve months,
2. $5000 a month for the next twelve months,
3. $3000 a month for the next twelve months, and
4. $1000 a month for the last twelve months.
b. The forty-eight month period is non-modifiable as to term and the payments are non-modifiable as to amounts, except upon the death of either party or remarriage of the plaintiff wife, at which time said payments shall cease.
3. LIFE INSURANCE
a. Defendant husband shall maintain a four year straight line declining term life insurance policy upon his life in the original amount of $200,000 with plaintiff wife as irrevocable beneficiary as long as his alimony obligations hereunder continue.
b. Defendant shall not pledge, assign or otherwise hypothecate said insurance policy. Nor shall defendant permit loans or liens of any kind to encumber the policy.
c. Defendant shall provide plaintiff with proof that said insurance is in full force on September 15th of each year beginning in 1990. In addition, defendant shall do whatever is necessary to enable plaintiff, or her representative, to semi-annually communicate directly with defendant's life insurance carrier for purposes of additional independant confirmation.
d. If defendant dies without plaintiff receiving said insurance CT Page 1300 proceeds, defendant's estate shall be liable for the unpaid balance of the amount due. This is not intended to permit defendant to avoid the purchase and maintenance of the policy as set forth herein. Plaintiff may compel defendant to purchase such insurance.
4. TRUSTS
a. The court notes that plaintiff wife has volunteered to resign as trustee or beneficiary, whichever positions she may hold, from all trusts and insurance created or acquired during the marriage. She has also volunteered to resign as an officer and transfer any ownership interest she may have in NT Surgical Inc. to the defendant husband.
b. Plaintiff wife urges that she be permitted to undertake the resignations and transfers without the compulsion or court orders.
c. Based upon her pledge to fulfill these promises, the court will withhold formal orders at this time, subject to reconsideration if the resignations and transfers have not all been accomplished to defendant husband's satisfaction ninety days from this date
5. CHINA SERVICE
Plaintiff wife is to receive the china service for eighteen and the sterling silver in addition to her share of the marital assets.
JOSEPH L. STEINBERG, Judge.